Filed 2/11/15  J.E. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

J.E.,

     Petitioner,

v.

THE SUPERIOR COURT OF
SAN BERNARDINO COUNTY,

     Respondent;

SAN BERNARDINO COUNTY
CHILDREN AND FAMILY SERVICES,

     Real Party in Interest.

E062133

(Super.Ct.No. J244564, J244565 &
J244566)

OPINION

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cheryl C. Kersey,

Judge.  Petition denied.

Valerie M. Ross for Petitioner.

No appearance for Respondent.

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich and Kristina M. Robb,

Deputy County Counsel, for Real Party in Interest.

1

Petitioner J.E. (Mother) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order sustaining a Welfare and Institutions Code[1] section 387 petition, denying her further reunification services, and setting a section 366.26 hearing as to her three children. Mother claims that there was insufficient evidence to sustain the section 387 petition removing the children from her care and that the juvenile court abused its discretion in denying her further reunification services. We find no error, and deny Mother's writ petition.

I

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Department of Children and Family Services (CFS) in February 2012 after Mother, who was then almost 22 years old, had tested positive for amphetamines when she gave birth to J.E. Mother had admitted to using alcohol and methamphetamine during the pregnancy and not having prenatal care or provisions for the baby.

The social worker had attempted several times to contact the family by visiting the home and sending a certified letter. The social worker did not make contact with Mother until April 4, 2012, at the maternal grandparents' home. The home was found to be filthy and cluttered. Mother and her three children, then two-year-old I.E., one year-old D.L.E., and three month-old J.E., shared a queen-sized mattress located on the floor in the middle of a room.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

Mother reported that the father of her eldest child is J. She did not know J.'s last name and whereabouts. She had met J. in Las Vegas when she was 17 years old. Mother also reported that the father of her two younger children is I.L. I.L. was 19 years old and lived locally, but Mother was no longer in a relationship with I.L.[2] Mother also disclosed that she began using methamphetamine when she was 15 years old and had used it on and off for a few years. She had stopped using methamphetamine when she had her first child and started again after the second child was born.

On April 16, 2012, Mother agreed to submit to a drug test. However, on April 24, 2012, CFS received notice that Mother was a "no show." CFS recommended that Mother participate in Voluntary Family Maintenance Services consisting of an outpatient drug program, random drug testing, and a parenting class. Mother, however, continued to be a no-show for drug testing; and on May 24, 2012, Mother informed the social worker that although she had not used methamphetamine since the baby's birth, she had smoked marijuana almost every night. The social worker offered Mother a chance to participate in a meeting with CFS, but Mother failed to appear at the scheduled meeting.

On June 5, 2012, the children were taken into protective custody and placed in foster care.

On June 7, 2012, petitions pursuant to section 300, subdivision (b), were filed on behalf of the children. The children were formally detained the following day and eventually placed with their maternal aunt on July 12, 2012.

_____

[2] Neither father is a party to this appeal.

At the August 8, 2012 jurisdictional/dispositional hearing, the juvenile court sustained the dependency petitions and declared the children dependents of the court. Mother was provided with reunification services and ordered to participate. Some of the objectives of her case plan were to remain sober, live free from alcohol and drugs, and avoid arrests and convictions.

Mother initially failed to participate in her court-ordered services. She refused to submit to random drug testing or acknowledge that she had a substance abuse problem. She was also uncooperative and would not abide by the visitation schedule. However, by October 2012, Mother admitted that she could not control her drug problem and asked to go into a residential drug treatment program. Mother entered a 90-day residential treatment program on October 26, 2012, and had begun to make good progress in her case plan. She agreed to continue in an outpatient drug program when she completed her inpatient program, demonstrated appropriate parenting skills, and accepted that she had a drug problem.

Due to Mother's progress, at the February 7, 2013 six-month review hearing, the juvenile court continued Mother's services and set a 12-month review hearing.

On May 16, 2013, in light of Mother's continued progress and maintenance of sobriety, the court granted overnight unsupervised visits to Mother. On July 19, 2013, the court granted Mother extended visits from July 26, 2013, to August 9, 2013.

By the 12-month review hearing, Mother was cooperative and had continued to participate in her case plan. She had graduated from her 90-day inpatient residential drug treatment program, had enrolled in an outpatient drug treatment program, and had

4

continued to test negative for drugs. Mother had also completed a parenting program and general counseling. She had moved in with the maternal aunt; however, the maternal aunt had moved to another home to allow Mother to move in with her children. Mother was still unemployed and was searching for employment. She was to apply for cash-aid and would receive Wraparound and Screening, Assessment, Referral and Treatment (SART) services. The children were developing well, and had adjusted well to living with their maternal aunt. They were bonded to the maternal aunt and were thriving in the structured environment.

At the August 9, 2013 12-month review hearing, the court ordered the children returned to Mother's care on family maintenance. The court approved Mother's family maintenance plan and ordered Mother to participate in family maintenance services. The court authorized the social worker to dismiss the matter by approval packet. Several of the objectives of her family maintenance services were to remain sober, live free from alcohol and illegal drugs, and avoid arrests and convictions.

At some point, Mother and the children moved in with the children's father I.L. to try and establish a family. However, sadly, I.L. was hit by a car and died on September 14, 2013. Mother had returned to living with her relatives, and had continued to be cooperative with CFS and participate in her services. She tested negative for drugs, attended Alcoholic Anonymous (AA)/Narcotics Anonymous (NA) meetings, and provided a stable home for the children.

However, Mother began to relapse. At the semi-annual review hearing on February 7, 2014, CFS requested a continuance because Mother had failed to show for

5

drug testing and wanted to ensure the drug test was negative. Minors' counsel also noted that during a home visit to Mother's home, there was inappropriate bedding for the children, and requested a continuance to follow up with Mother in regards to a crib for the baby and appropriate bedding for the two older children. The court granted a six-week continuance and ordered Mother to comply with the family maintenance plan and to drug test as directed. The court authorized CFS to dismiss the case by approval packet before the next hearing if appropriate.

Mother had initially been doing well and cooperating with her family maintenance services. However, she had a hard time coping with the death of I.L., and began making wrong decisions. On February 13, 2014, Mother had asked for outpatient services but failed to follow through and complete the program. She had five negative drug tests and two positive tests for marijuana. She was terminated from her outpatient drug treatment program on July 3, 2014. In addition, Mother had been arrested three times since the February 7, 2013 review hearing. She was arrested on May 1, 2013, for resisting a police officer, and subsequently placed on probation; on June 2, 2014, for disorderly conduct for being under the influence of alcohol/drugs; and in September 2014, for alcohol. Moreover, CFS had received two referrals of physical abuse to I.E. during the last six months. The allegations were unfounded, but Mother did not have appropriate caretakers for the children. Mother had obtained her own apartment, but had appeared to be overwhelmed as she had relied on relatives for help. Mother had failed to keep her appointments with Wraparound services, and had refused Therapeutic Behavioral Services for I.E. despite the then-five-year-old child digressing to having behavioral

6

problems. I.E. had temper tantrums when he was away from Mother and had made comments about going back to foster care.

Mother had also failed to maintain regular contact with CFS. When Mother moved into her own apartment, she failed to provide the new address to CFS, and the social worker had to look for Mother at a relative's home and at Mother's place of work. When asked why she did not attend her meetings and provide her current address, Mother claimed that she forgot to call or attend. Consequently, the social worker had concerns about Mother's ability to provide a safe environment for the children and believed Mother required further supervision and support from CFS.

At a semi-annual review hearing on August 7, 2014, counsel for CFS advised the court that if Mother continued with her lack of cooperation, CFS was considering removing the children. Minors' counsel asked the court to set the matter contested and, if necessary, counsel would file a section 388 petition to change or modify the court's previous order. Mother indicated that she was willing to participate in the services and cooperate with CFS. She also agreed to drug test that day. The court ordered Mother to participate in her services and also to drug test that day. The court continued the hearing for three weeks and authorized the social worker to remove the children from Mother's care if Mother did not participate and cooperate with CFS.

On August 27, 2014, CFS informed the court that Mother had failed to abide by the court's order to participate in her services. Mother had agreed to stop by the Wraparound office following the August 7, 2014 hearing, but failed to do so. She was advised that CFS had filed a referral for outpatient services and that Mother needed to

7

make an appointment. She, however, missed two intake appointments and did not go until August 21, 2014. She had also failed to enroll I.E. in kindergarten prior to the August 14, 2014 school start date even though she had all summer to obtain the necessary documents and enroll him. She eventually enrolled I.E. in school on August 22, 2014. Mother also missed two Wraparound meetings on August 13 and 18, 2014, and failed to bring D.L.E.'s documents as requested on August 19, 2014. Mother also did not participate in her outpatient substance abuse sessions; however, she had tested negative for drugs and alcohol on August 21, 2014, and had attended the 12-step/self-help support meetings. CFS noted that Mother had shown little progress during the last three weeks and was concerned about maintaining the children in Mother's home.

On August 28, 2014, minors' counsel filed a section 388 petition, requesting removal of the children from Mother's care and custody.

At a hearing held on August 28, 2014, the juvenile court found removal of the children was appropriate and requested CFS to file a section 387 petition on behalf of the children. Minors' counsel thereafter withdrew the section 388 petition. The court ordered the children to be removed from Mother's custody that day and ordered Mother to cooperate with the removal.

Mother did not cooperate with the children's removal. CFS had gone to I.E.'s elementary school, but the maternal grandmother had already taken him out of school that morning. CFS called Mother at noon asking her to bring the children to CFS's office to avoid law enforcement involvement. Mother agreed to bring the children to the office at 1:30 p.m. At 1:45 p.m., CFS contacted Mother, and Mother stated that she told the other

social worker that she would bring the children at 3:00 p.m. Mother was told to have the children at the office in 20 minutes or law enforcement would be contacted. Mother arrived at 2:00 p.m. without the children's belongings and with the maternal aunt, who was telling the children that "it was not their fault" and that CFS had "something against their mother."

On August 29, 2014, petitions pursuant to sections 342 (subsequent) and 387 (supplemental) were filed on behalf of the children. The petitions alleged that Mother's substance abuse had rendered her unable to provide adequate and responsible care for the children in that she neglected the children's needs and had been arrested on at least two occasions (b-1); that Mother had consistently failed to cooperate with court-ordered family maintenance services (s-2); and that Mother had failed to benefit from the services provided to her to maintain her sobriety in that she had recently been arrested for being drunk in public (s-3).

The children were formally detained on September 2, 2014.

CFS recommended that the allegations in the petitions be found true and that Mother be denied reunification services. The social worker noted that during the first six months the children were returned to Mother, Mother was complying with her services and able to provide the children with appropriate housing. However, after the children's father died, Mother's behavior descended. The social worker had requested Mother to go to the Department of Behavioral Health (DBH) to be treated for depression, but Mother failed to make an appointment despite her repeated promises to do so. She then began testing positive for marijuana and stated that she had a medical marijuana card to combat

9

her depression. After the social worker informed Mother that having a marijuana card in lieu of counseling was indicative of inappropriate parenting skills, Mother agreed to stop smoking marijuana and cooperate with Wraparound services. Nonetheless, Mother continued to test positive for marijuana and failed to cooperate with Wraparound services. Mother subsequently ceased using marijuana but substituted that substance for alcohol. Mother had tested positive for alcohol on September 4, 2014, and had been arrested in May 2014 for resisting arrest and in June 2014 for disorderly conduct due to being under the influence of alcohol/drugs. Mother failed to appear at her arraignment on August 28, 2014, for the criminal charges, had a warrant for her arrest, and was considered a fugitive by the criminal court.

A contested jurisdictional/dispositional hearing on the sections 342 and 387 petitions was held on October 16, 2014. At that time, Mother testified that she was living with the children's father, I.L., but on September 14, 2013, he had passed away. As a result, she had obtained a medical marijuana card to help her eat and sleep regularly. She claimed that she had stopped using marijuana on February 25, 2014, and had tested negative since then; that she had appropriate housing and food for the children; that she had arranged appropriate babysitting for the children with the maternal great-grandmother; and that she had maintained a job at Pizza Hut for the past eight months. She also claimed that she was in good standing with the criminal court over her two recent arrests; that she was on summary probation for resisting a peace officer; that she was on work release for being arrested in September 2014 for alcohol; and that the cases would be dropped when she completed her work release. Mother admitted to being

10

arrested three times and testing positive for alcohol after she had completed inpatient and outpatient substance abuse programs.

Following arguments from counsel, the court found the allegations in the petitions true and removed the children from Mother's custody. The court noted that in "the big scheme of things" Mother's recent infractions and behaviors were "minor," but that they could not be looked at separately. The court explained that the children were removed in 2012; that Mother had engaged in services for over a year; that the children were returned to Mother in August 2013; and since their return, Mother had failed to respond to efforts by the social worker and Wraparound services and instead began using marijuana and alcohol and getting arrested. The court acknowledged Mother's unfortunate circumstances with the death of the children's father, but noted that "when you have three children," Mother could not use that death as an excuse. The court further noted that Mother was not asking for a second chance, but a fourth chance. The court denied Mother's request for further reunification services because Mother had failed to complete her services and her time had lapsed. It appears the court also denied Mother services under section 361.5, subdivision (b)(13). The court thereafter set a section 366.26 hearing.

On October 20, 2014, Mother filed a notice of intent to file a writ petition.

11

II

DISCUSSION

A.      *Section 387 Petition*

Mother contends that there was insufficient evidence to support a finding that the previous disposition had not been effective in protecting the children and that the evidence was insufficient to support the order removing the children from her custody. She argues that despite her relapses due to grieving over the death of the children's father, the children were protected; she had maintained her job; she had secured her grandmother to watch the children; the older children were in school; and the home was found to be clean with adequate food. Consequently, she appears to claim that the previous disposition was effective in addressing the issues giving rise to the dependency and that there was no evidence the children were placed at risk. She further argues that the children would have been protected under a family maintenance plan if left in Mother's care.

Our review of a challenge to the sufficiency of the evidence is guided by familiar principles. "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) All conflicts must be resolved in favor of the respondent and all legitimate inferences must be indulged in support of the juvenile court's findings. (*Ibid.*) The party challenging the finding bears the burden of showing there is insufficient evidence to

12

support the juvenile court's finding. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) The substantial evidence standard also applies to findings that must be made by clear and convincing evidence. (See *In re Henry V.* (2004) 119 Cal.App.4th 522, 528-529.)

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. [Citations.] If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161; see § 387; Cal. Rules of Court, rule 5.565(e); *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200.)

In order to remove a child from parental custody under a section 387 supplemental petition, the juvenile court must make the same findings as those necessary to remove a child from parental custody at the initial disposition hearing under section 361. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462.) Thus, before a minor can be removed from the parent's custody, the court must find, by clear and convincing evidence, that there is a "substantial danger to the physical health, safety, protection, or physical or emotional

13

well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . ." (§ 361, subd. (c)(1); *In re Javier G.*, *supra*, at p. 462.) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163.)

The initial incident that brought the children within the jurisdiction of the juvenile court involved Mother being unable to provide adequate and responsible care for the children due to her substance abuse. Some of the objectives of her case plan and family maintenance services were to remain sober, live free from alcohol and drugs, and avoid arrests and convictions. Although Mother had apparently ceased using marijuana and methamphetamine by the time the section 387 supplemental petitions were filed in August 2014, her abuse of alcohol and arrests remained a concern, and her case plan retained the objective of remaining alcohol-free as well as free from drugs and avoiding arrests and convictions. Plainly, the prior disposition was ineffective in preventing Mother from abusing alcohol, which apparently had resulted in her arrests and putting her children at risk. Further, despite her claim that the children were protected, Mother failed to follow-up on the children's medical care, educational services, and developmental needs. There were two unfounded referrals of physical abuse to I.E., and Mother did not have appropriate caretakers. She had also failed to participate and cooperate with

14

Wraparound services, and I.E.'s behavior had declined since he was not attending Wraparound services. It appears that a consistent theme in the dependency proceedings was Mother substituting one substance for another in order to combat her depression and grief. Mother admitted that she was suffering mentally following the death of the children's father, but refused the social worker's repeated requests to obtain grief counseling; instead, she resorted to smoking marijuana and drinking alcohol, thereby failing to protect the children and placing them at risk of harm.

The pertinent question in a section 387 proceeding is whether the previous disposition has been effective in protecting the minor. We conclude there was sufficient evidence to support a finding that the previous disposition was ineffective in protecting the children.

The record in this case also supports a finding that Mother was unable to provide proper care for the children and that they would be at risk of harm if they remained in her custody. At the time of the section 387 dispositional hearing in October 2014, Mother had had almost two and a half years of family maintenance and reunification services, including participation in Wraparound services, inpatient and outpatient substance abuse programs, parenting classes, counseling, and other services. In spite of these services, Mother had established a poor track record of remaining sober and staying away from drugs and alcohol. She had multiple relapses involving marijuana and alcohol. The recent September 2014 incident involved a relapse with alcohol and was yet another occasion in which she was arrested for alcohol. Since the children were returned to Mother's care in August 2013, Mother had three arrest incidents; one resulting in her

15

being placed on probation and another on work release.  Further, despite the social worker's repeated requests and Mother's promises to do so, Mother had failed to participate and cooperate in Wraparound services and meet the children's physical, developmental, educational, and emotional needs.  Under the circumstances, removal of the children from Mother's custody was supported by clear and convincing evidence.

B.      *Denial of Reunification Services*

Mother also argues there was no clear and convincing evidence to support a finding that she should be bypassed for further reunification services under section 361.5, subdivision (b)(13).  CFS responds that the court did not need to rely on section 361.5, subdivision (b)(13), because it had denied Mother services since Mother's time had lapsed.

When, as here, a child is under three years of age at the time of removal, court-ordered reunification services "shall be provided for a period of six months from the dispositional hearing . . . but no longer than 12 months from the date the child entered foster care . . . ."  (§ 361.5, subd. (a)(1)(B).)  A child is "deemed to have entered foster care on the earlier of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian."  (§ 361.49.)  The presumptive time limit for services "may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it can be shown, at the [12-month review hearing] held pursuant to subdivision (f) of section 366.21, that the permanent plan for the child is that he or she

16

will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3); see *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 [parent of child under three was presumptively entitled to six months of services under former version of § 361.5].)[3]

Here, the children were detained in foster care in June 2012. The jurisdictional and dispositional hearings were held in August 2012. At the time of the jurisdictional and dispositional hearing, I.E. was three years old, D.L.E. was almost two years old, and J.E. was five months old. Using J.E.'s case as the reference point, Mother was presumptively entitled to reunification services for six months from the dispositional hearing (until February 2013), with an outside limit of 12 months from the time J.E. "entered foster care" (August 2013). If the court found a substantial probability of return or the provision of inadequate services by CFS, Mother would have been entitled to up to 18 months of services from the date of the children's original removal from her physical custody in June 2012. Mother received reunification services from June 2012 until August 2013 (when the children were returned to her), family maintenance services until

---

[3] Section 361.5, subdivision (a)(4), allows for an additional extension of services, not to exceed 24 months after the date the child is placed in foster care, but only in cases where the parent has been making significant progress in a court-ordered residential substance abuse treatment program, or has recently been discharged from incarceration or institutionalization. (§ 361.5, subd. (a)(4); see § 366.22, subd. (b).) Those circumstances are not present here.

17

August 2014 (when the children were again removed from her custody), and additional court services until at least October 2014 (after the children were detained following the hearing on the sections 342 and 387 petitions). She had, therefore, received more than the statutory maximum of 18 months of court-ordered services. (See *In re N.M.* (2003) 108 Cal.App.4th 845, 853 [Fourth Dist., Div. Two], superseded by statute on other grounds in *In re T.W., supra,* 214 Cal.App.4th at p. 1168 [18-month limitation in § 361.5 applies to combination of reunification and maintenance services]; *Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 166-167 [when subsequent petition under § 387 is sustained, case does not go back to " 'square one' " with respect to reunification services; but picks up where case left off chronologically].)

Mother here received more than 28 months of services, and she does not argue the services provided by CFS were unreasonable. Case law has recognized that the juvenile court has the implied authority to extend the 18-month maximum for reunification when reasonable services have not been offered. (See *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016-1017 [no reasonable services ever provided to parent during reunification period]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1209 [social worker had never spoken to mother; trial court had found services to be a " 'disgrace' " but erroneously felt constrained to terminate reunification after 18 months]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [social services agency failed to develop reunification plan for father].) However, there is nothing in the record to suggest that the services provided in Mother's case were inadequate or that CFS failed to develop a reunification plan for Mother.

18

"The resulting total hiatus of [28] months manifestly would not advance the legislative purpose of minimizing delay in dependency proceedings."  (*In re N.M.*, supra, 108 Cal.App.4th at p. 855.)  " 'While [28 months] may not seem a long period of time to an adult, it can be a lifetime to a young child.' "  (*Ibid.*, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)  Having received over 28 months of reasonable court-ordered services, Mother was not entitled to additional services after the court sustained the petitions under sections 342 and 387.

Moreover, as the juvenile court also found, Mother was not entitled to services pursuant to section 361.5, subdivision (b)(13).  Pursuant to section 361.5, subdivision (a), "[w]hen a child is removed from the custody of his parents, reunification services must be offered to the parents unless one of several statutory exceptions applies."  (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.)  The juvenile court, however, "need not" provide a parent reunification services if it finds, by clear and convincing evidence, that any of the exceptions set forth in section 361.5, subdivision (b), apply.  (§ 361.5, subd. (b).)  In *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744, superseded by statute as stated in *In re Angelique C.* (2003) 113 Cal.App.4th 509, 518 and *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1113, the California Supreme Court stated, " '[o]nce it is determined one of the situations outlined in [section 361.5,] subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.  [Citation.]' "

As pertinent to this case, section 361.5, subdivision (b)(13), provides that reunification services need not be provided when the court finds by clear and convincing

evidence "[t]hat the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

Although Mother does not dispute that she has a history of chronic use of drugs and alcohol, she argues there has been no showing she resisted treatment or failed or refused to comply with a substance abuse treatment program, because she had voluntarily participated in the various programs offered to her and was able to remain clean of methamphetamine and had not tested positive for marijuana since about 10 months ago. The Court of Appeal faced a similar claim in *Karen S. v. Superior Court* (1999) 69 Cal.App.4th 1006 (*Karen S.*). There, although the parent voluntarily sought out treatment programs, the evidence established the parent never had a significant period free from substance abuse. (*Id*. at p. 1009.) The court concluded the parent resisted treatment within the meaning of the statute "by failing to benefit from treatment for his chronic use of illicit drugs and alcohol." (*Ibid*.) In interpreting the meaning of the word "resist," the court observed that resistance can be either active or passive. A parent can "passively resist by participating in treatment but nonetheless continuing to abuse drugs or alcohol, thus demonstrating an inability to use the skills and behaviors taught in the program to maintain a sober life." (*Id*. at p. 1010.)

Here, just as in *Karen S.*, the evidence shows passive resistance by Mother to court-ordered treatment.  As evidenced by the multiple instances of relapse, Mother repeatedly demonstrated an inability to use the skills taught to her in various treatment programs to maintain a sober drug- and alcohol-free life.  Consequently, there was substantial evidence to support the court's order denying reunification services to Mother under section 361.5, subdivision (b)(13).

III

DISPOSITION

The petition for extraordinary relief is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

KING
J.

21